Estate of Lilly A. Fleischmann, Deceased, Louise F. Tate and Julius Fleischmann, Executors v. Commissioner.Estate of Fleischmann v. CommissionerDocket No. 37025.United States Tax CourtT.C. Memo 1954-5; 1954 Tax Ct. Memo LEXIS 242; 13 T.C.M. (CCH) 362; T.C.M. (RIA) 54111; April 12, 1954, Filed John H. Clippinger, Esq., and Alan R. Voegler, Esq., for the petitioners. William R. Bagby, Esq., for the respondent. TURNER Memorandum Findings of Fact and Opinion TURNER, Judge: The respondent determined a deficiency in estate tax against the taxpayer of $909,587.97. The question for decision is whether assignments of single premium deferred payment insurance policies and additional premium payments thereon by the decedent to her grandchildren and transfers by decedent to irrevocable trusts of which her son and daughter and their descendants were beneficiaries were transfers made in contemplation of death within the meaning of section 811 (c) of the Internal Revenue Code. Findings of Fact Some of the facts*243 have been stipulated and are found as stipulated. Lilly A. Fleschmann, who at the date of her death was a resident of Groton, Connecticut, died on June 13, 1947. Julius Fleischmann and Louise F. Tate are executors of her estate, appointed by the Probate Court of the District of Groton. They reside in Indian Hill, Ohio. The estate tax return was filed with the collector of internal revenue for the district of Connecticut. The executors filed the estate tax return involved herein within fifteen months after decedent's death and therein elected to have the gross estate of decedent valued in accordance with values as of a date or dates subsequent to decedent's death as authorized by section 811 (j) of the Internal Revenue Code. This return reported a gross estate of $329,191.06, upon which estate tax of $59,062.53 was paid. None of the transfers in question were included in the estate tax return as part of the gross estate for estate tax purposes. Lilly Ackerland Fleischmann, the decedent, was born December 16, 1872. She was married on April 12, 1893, to Julius Fleischmann, Sr. Three children were born of this marriage: Louise, born in 1895; Charles, born*244 in 1896; and Julius, born in 1900. Charles Fleischmann died in 1917 as a result of an airplane accident while in training for the United States Army air service during the First World War. He was unmarried. Louise Fleischmann married Henry C. Yeiser, Jr., in 1916, and they had three children: Henry C. Yeiser, 3rd., born in 1918; Charles Fleischmann Yeiser, born in 1921; and Eric B. Yeiser, born in 1925. Louise and Henry Yeiser were divorced in 1933. Henry C. Yeiser, 3rd., died in 1935, and Henry C. Yeiser, Jr., died in March 1936. Louise married Benjamin E. Tate in August 1936. They had no children. Julius Fleischmann married Dorette L. Kruse and they had three children: Charles Fleischmann, 3rd., born in 1928; Dorette Louise Fleischmann, born in 1931; and Joan Fleischmann, born in 1943. The decedent was divorced from Julius Fleischmann, Sr., on January 22, 1920, and did not remarry. On January 20, 1920, just before decedent and her husband were divorced, he made a trust for her benefit and that of his two children then living. This was modified in December 1922, by agreement of all concerned, so as to give the children their shares of the trust corpus outright, decedent's share*245 remaining, as originally, a life interest with the remainder to her children or their descendants. The assets of the trust consisted at its inception and until 1929 of common stock of the Fleischmann Company. In 1929 the Fleischmann Company consolidated with other companies, becoming Standard Brands, Inc., a Delaware corporation. The Fleischmann Company had been an Ohio corporation. Under the Ohio tax laws then in effect, securities held in Ohio of corporations which were not incorporated in Ohio were taxed at a very high rate. For this reason, the trust which had been held by an Ohio bank was dissolved with the consent of all parties and was reinstated with the New York Trust Company of New York City, as trustee; Standard Brands, Inc., stock for which Fleischmann Company stock had been exchanged, then constituted the corpus of the trust. The value of the assets of this trust at the time it was established in New York in 1929 was $10,909,554.19; at the time of decedent's death the value of the assets was approximately $6,000,000. Lilly Fleischmann received the income from the above trusts continually from January 20, 1920, until her death on June 13, 1947. The income reported by*246 her on her Federal income tax returns for the years 1926 to 1947 is as follows: YearNet Income1926$316,418.311927482,581.911928567,851.601929568,378.511930160,746.931931291,835.391932389,403.951933337,667.821934339,521.831935279,201.511936308,242.261937253,100.441938169,357.481939148,928.741940140,583.231941166,546.661942112,904.131943127,713.531944131,595.571945160,258.361946177,292.121/1 to 6/13/4766,573.66Julius Fleischmann, Sr., died on February 5, 1925, at the age of 52 years, after an illness of one day, following a heart attack while playing polo. At the time of his death he had been married and divorced from a second wife. He left a will dated August 29, 1924, devising the residue of his estate in equal shares to his living children, Julius Fleischmann and Louise Yeiser. Julius Fleischmann and Louise Yeiser each received assets from their father's estate after his death in 1925 valued at approximately $6,000,000. Throughout the years 1933 and 1934, exclusive of the cash surrender value of life insurance policies owned by them and exclusive of their remainder interest*247 in the trust of December 1929 of which their mother was life beneficiary, Julius Fleischmann and Louise Yeiser had assets in their own names valued at more than $12,000,000 and $9,900,000, respectively. Under date of May 12, 1933, the decedent made applications to the Penn Mutual Life Insurance Company for five single premium "Optional Deferred Income" policies to be based on the lives of her five grandchildren. On or about the same date, she paid over $100,000, being the aggregate of five single premiums of $20,000 required for the issuance of the policies applied for. Pursuant to the applications, Penn Mutual issued the five policies on May 27, 1933, as follows: PolicyDate ofMonthlyOr oneNumberOn the Life ofBirthIncomeCommencingSum of1759125Charles Fleischmann, 3rd9-29-28$643.405-27-84$109,064.201759126Eric B. Yeiser2- 5-25560.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,043.001759127Henry C. Yeiser, 3rd3- 1-18* 460.005-27-73* 75,000.001759128Dorette L. Fleischmann6-15-31670.005-27-87120,921.401759129Charles F. Yeiser2- 1-21488.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,824.60*248 As issued, each of the policies provided for the payment of the monthly income indicated to "Lilly A. Fleischmann, her executors, administrators or assigns," commencing on the dates specified above, and she, her executors, administrators or assigns, were also named the death beneficiaries. The grandchild in each instance was identified as the "annuitant," the maturity of the policies being based upon their lives. It was provided in each policy that the "annuitant" did not have the right to change the beneficiary. Under none of the five policies would the payments pursuant to the monthly income option commence prior to the one hundredth year after the decedent's birth, and in applying for the policies she had no intention of retaining them as her own but intended to assign them to her respective grandchildren named therein. On January 17, 1934, decedent executed and delivered to Penn Mutual an assignment of each policy to or for the benefit of the grandchild named therein as "annuitant." With respect to the grandsons, the assignments provided, among other things, that the "income payments" should be paid to the "annuitant." The right to assign or surrender the policy for cash, *249 loan or other value should be in Louise F. Yeiser, 1 decedent's daughter, if living; then in the legal guardian if the grandson had not attained legal age; and if the grandson had attained legal age, then in the grandson and the trustee or executor under the will of Louise Yeiser, or her administrator, if she died intestate. In the case of the granddaughter, the assignment provided that at June 15, 1956, the cash surrender value of the policy should automatically become payable and the cash retained by Penn Mutual under the interest option and the interest paid to the granddaughter on the interest date, until 1981, when the cash value should become payable. The right of assignment or surrender of the policy was placed in Julius Fleischmann, the decedent's son and the granddaughter's father, or to her legal guardian if her father should die, until the granddaughter should reach the age of 25 years. After the death of Julius and the attainment of legal age by the granddaughter, then such rights were to be jointly in the granddaughter and the trustee or executor under her father's will, or if he had died intestate, the administrator of his estate. After the assignments, the decedent*250 retained no rights, powers or interests in or over the policies. The decedent acquired the above policies at the suggestion of the son of a very close friend who had only recently become an insurance agent. The policies were represented to her as highly satisfactory from a business point of view, and she desired to be of assistance to her friend's son. Each of the five policies provided that additional premiums up to a total of $200,000 might be paid in installments of not less than $1,000 each, thereby increasing the benefits thereunder. On December 6, 1934, petitioner paid an additional premium of $10,000 on each of the policies, and on December 10, 1935, an additional $5,000, except on that of Henry Yeiser, 3rd, who had died approximately two months prior thereto. On March 28, 1936, she paid an additional $5,000 on each of the four policies remaining. Decedent's daughter, Louise Yeiser, had taken out life insurance policies on herself in the amount of $621,000, and on her husband in the amount of $1,750,000. The premiums on these policies cost*251 Louise Yeiser $39,900 in 1934. Decedent's son, Julius Fleischmann, had taken out insurance policies on his life in the total amount of $2,200,000, on which he paid premiums of $39,400 in 1934. Julius Fleischmann suggested to his mother that she transfer to two trusts securities in an amount which, based on an income tax rate then in effect, would bring an income sufficient to pay the premiums on the above-mentioned insurance policies. At the same time he and Louise Yeiser would assign to the same trusts these insurance policies and would pay their mother enough in cash to cover the gift taxes which she would have to pay for making the transfer. If during the lives of Julius Fleischmann and Louise Yeiser the income of the respective trusts should be more than adequate for paying the premiums on the policies, the income so remaining was to be distributed to Julius and Louise. The assets of the trusts were in the end to be distributed to decedent's grandchildren or their issue. At the time the trusts were created, decedent's business affairs were generally handled by her son at an office in Cincinnati, where he also cared for his own and his sister's business affairs. He conducted these*252 affairs with the aid of accountants, lawyers and financial advisers. He indicated to decedent that this trust arrangement would be good business, as she was in the high income tax bracket, as she did not need her full income, and as this would relieve her children of the application of a substantial portion of their spendable income to the maintenance of the insurance policies. On December 29, 1934, decedent executed and acknowledged as donor two trust instruments, each of which was styled "Lilly A. Fleischmann Trust with Chase National Bank." The first of these trusts will hereinafter be called the "Fleischmann Trust," the second will be called the "Yeiser Trust." On December 31, 1934, decedent executed two instruments by which she authorized the deletion of certain words from the instrument creating the Fleischmann Trust and certain changes in the text of the instrument creating the Yeiser Trust. The four instruments were delivered at decedent's instructions to the Chase National Bank of New York on December 31, 1934; thereupon the deletions and changes were made and thereafter the bank executed and acknowledged the trust instruments and accepted the trusts so created. The Chase*253 National Bank is still the trustee of both trusts. On December 31, 1934, pursuant to the terms of the trust instrument and agreement with Julius Fleischmann, decedent transferred to the Chase National Bank securities having a value at that time of $969,941.27 and cash in the amount of $15,000, making a total of $984,941.27. Julius Fleischmann, on the same day, assigned to the Fleischmann Trust insurance policies in the face, or maturity, amount of $2,200,000 on his life. The Yeiser Trust consisted of two trusts, namely, "Trust Estate A" and "Trust Estate B." Decedent, pursuant to the terms of the trust instrument and agreement with Louise Yeiser, on December 31, 1934, transferred to the Chase National Bank, as trustee for Trust A, securities having a value at that time of $132,064.13, and on February 13, 1935, transferred cash in the amount of $10,000. Decedent transferred to the Chase National Bank, as trustee for Trust B, on December 31, 1934, securities having a value of $838,639.23 and cash in the amount of $15,000, making a total of $852,638.23. Louise Yeiser assigned to the Chase National Bank, as trustee for Trust A, life insurance policies on her life in the face amount*254 of $621,022; she assigned to the Chase National Bank, as trustee for Trust B, life insurance policies owned by her on the life of her former husband, Henry C. Yeiser, Jr., in the face amount of $1,750,000. Payments to the decedent of $100,000 each to pay the gift tax on her transfers to the trusts were duly made by Julius Fleischmann and Louise Yeiser on December 29, 1934, in accordance with the terms of the agreements of December 29, 1934. The total amount of securities and cash transferred by decedent to the Fleischmann and Yeiser Trusts was $1,969,643.63. The value as of the optional valuation dates of these assets and their proceeds, investments, and reinvestments has been stipulated to be $2,472,590.31. The premiums paid in 1935 by the Chase National Bank as trustee under the Fleischmann and Yeiser Trusts on the insurance policies transferred by Julius Fleischmann and Louise Yeiser were: Julius Fleischmann$39,389.20Louise Yeiser5,598.00Henry C. Yeiser, Jr.34,299.50The income tax return of the Fleischmann Trust for 1935 showed gross income of $37,620.26 and a tax of $4,141.10; the income tax return of the Yeiser Trust (Trust Estate A) for 1935*255 shows gross income of $5,161.65 and a tax of $642; and the income tax return of the Yeiser Trust (Trust Estate B) for 1935 shows gross income of $30,840.22 and a tax of $2,806.01. The cash surrender values on the Fleischmann and Yeiser insurance policies at the time they were conveyed to the trusts, on December 31, 1934, were as follows: Julius Fleischmann$117,913.88Louise Yeiser and Henry C.Yeiser, Jr.324,713.78After making the transfers to the Fleischmann and Yeiser Trusts decedent's books of account showed a net balance of $4,929,735.95, consisting chiefly of the assets of the 1920-1929 trust held by the New York Trust Company. Decedent carried the assets of the 1920-1929 trust corpus on her books as being her assets, although she only had a beneficial interest in them. Prior to making the transfers decedent owned in her own right income-producing assets of $2,261,166.02. After making the transfers she had remaining $87,764.20 of income-producing assets, exclusive of the 1920-1929 New York Trust. Decedent's Federal income tax return and the fiduciary return of her New York trustee for 1934 showed a total income of over $450,000, excluding capital gains. *256 $38,500 was non-taxable interest. Under the 1934 Revenue Act, the surtax on incomes between $300,000 and $400,000 was 55 per cent. At the time the decedent made the first of the transfers, she was 61 years of age, and was only a little more than two years older when the last of the gifts was made. The largest transfer, that to the Chase National Bank, as trustee, was made when she was 62 years of age. At that time her life expectancy, based on the American Experience Tables, was 12.86 years. At the date of her death decedent was 74 years, 5 months, 27 days of age, fulfilling almost exactly her life expectancy. She died of a rupture of the left ventricle of the heart. At the time of her death, decedent was a resident of Groton, Connecticut, where she lived every summer. When not in Groton she was either traveling or living in Cincinnati. Until 1938 or 1939, when she was in Cincinnati she occupied a residence owned by her son, but from 1940 until her death, she maintained a suite of rooms at a Cincinnati hotel. During the years 1920 to 1946, inclusive, she filed her Federal income tax returns with the collector of internal revenue at Cincinnati, listing on her returns her address*257 as 4001 Carew Tower, Cincinnati, Ohio. During the period 1933 to 1936, decedent was interested in and took an active part in the civic affairs of Cincinnati. She gave large sums of money to erect barless cages and other improvements at the Cincinnati Zoo, personally supervising some of the work. She was a regular attendant at the Cincinnati Symphony Orchestra concerts. She was actively interested in the Cincinnati Park Board, the Cincinnati Art Museum and the Cincinnati Natural History Museum. Also while in Cincinnati she dined out a good deal, entertained often, and diverted herself with bridge playing. During this same period decedent was particularly active at her summer home, a large establishment with an appropriate staff of servants, where she entertained friends, her children and their friends, and her grand-children and their friends. She went sailing and swimming, walked back and forth to the beach where she frequently picnicked, took long automobile trips, hunting antiques, and to attend summer stock theater performances, dined out and danced at the neighboring hotel, and played a great deal of bridge. She suffered no ill effects from her experiences at the time of the*258 famous New England hurricane in 1937, when the high winds caused waters from the harbor to invade the first floor of her house. The windows and doors were blown in and the family was marooned for some time. Decedent while at her summer home also enjoyed watching the Navy ships from the large porch which commanded a view of New London Harbor. At about the same time she made the transfers to the Fleischmann and Yeiser Trusts in 1934, she purchased a small island, called Billy's Island, in the middle of the harbor, so that no one could erect buildings on it or place signs on it and thus obstruct her view of the harbor. During the wintertime decedent did a great deal of traveling. She took a European trip of some two months early in 1934, visiting Spain, Tangiers, French Morocco, Malta, Sicily and Greece. Immediately after the beginning of the year 1935, she cruised down the west coast of South America, visiting Peru and Chile, crossed the Trans-Andean railroad, and then came north along the eastern cost of South America, visiting Argentina, Uruguay and Brazil. In January and February of 1936, she took a trip to Guatemala and Mexico. In 1937 she spent several months on a trip to Europe, *259 Africa and the Near East, visiting England and France in addition to most of the Mediterranean countries. At the insistence of her son, because she was about to take the strenuous South American trip, decedent in November of 1934 had a physical examination. Although the doctor found that her blood pressure was higher than usual, he did not inform her of this, and told her there was nothing in her physical condition to prevent her departure. He cautioned her to go to higher altitudes gradually, which was his customary instruction to "people after middle age." During that trip, in addition to going to the height of 12,000 feet to cross the Andes, which required oxygen for some of those in the railroad train but which did not seem to trouble decedent, she went on a horseback trip in Peru and took an active part in the festivities of carnival time in Brazil. During the nine years, 1926 to 1934, inclusive, the decedent gave away to charities over $350,000, an average of almost $40,000 per year. In the years 1934 to 1946, inclusive, she gave away to charities something over $480,000, maintaining almost the same average for the 12 years of about $40,000 per year. Similarly, decedent began*260 substantial gifts to her family and friends in the year 1930, and in the five years 1930 to 1934, inclusive, she gave away to this group $434,000, excluding the transfers in dispute. She continued these gifts after making the transfers in question, and in the five years succeeding the largest transfer to the Fleischmann and Yeiser Trusts in December 1934, she gave away to friends and family $380,000. The assignments on January 17, 1934, by the decedent to each of her five grand-children of the $20,000 single premium deferred payment insurance policies on their lives and the later premium payments of $90,000 made by decedent to the insurer were not transfers in contemplation of death under section 811 (c) of the Internal Revenue Code. The transfers by decedent to the Fleischmann and Yeiser Trusts in the total amount of $1,969,643.63 were not in contemplation of death under section 811 (c) of the Internal Revenue Code. In addition to the administration expenses, including attorneys' fees, deducted on the Federal estate tax return, the estate has become obligated to pay additional expenses in connection with this proceeding. Opinion*261 Respondent has included in decedent's gross estate the insurance policies assigned by her in 1934, the additional premiums paid thereon during 1934, 1935, and 1936, and amounts transferred to two trusts established by her in 1934, as being transfers made in contemplation of death under section 811 (c) of the Internal Revenue Code. The bulk of the transfers in question were made over twelve years prior to decedent's death; the last took place in excess of ten years prior to her death. There is, therefore, no statutory presumption that the transfers were made in contemplation of death; however, the respondent's determination is presumptively correct and the burden is accordingly on the taxpayer to prove the incorrectness of that determination. We think it has succeeded in carrying this burden and has shown that the gifts were not made in contemplation of death. As pointed out by the Supreme Court in United States v. Wells, 283 U.S. 102, "The words 'in contemplation of death' mean that the thought of death is the impelling cause of the transfer," the "controlling motive prompting the disposition of the property," and that it follows that they do*262 not "embrace gifts inter vivos that spring from a different motive." A review of the facts of the transfers here in question and the evidential profile of the decedent make it apparent that the transfers were prompted by motives associated with life and were not in contemplation of death, and we have so found. Respondent makes much of the fact that the transfers followed by only a short time a visit by decedent to her physician. The evidence indicates, however, that there was no relationship between the two acts. The transfers of the insurance policies preceded the medical examination, and it appears that the trusts which were executed a month after the examination had their inception prior to that time. In addition, the evidence is that decedent had a favorable report from the doctor and in relation to her trip to South America was given only the customary instruction given "to people after middle age," namely, to go to the higher altitudes gradually. The evidence establishes that the gifts were not made in contemplation of death, and it will, therefore, serve no useful purpose to review the evidence further in this opinion. The taxpayer has claimed an additional deduction*263 for administration expenses, including attorneys' fees, as a result of this proceeding. The deductibility of such expenses is well settled and amounts in settlement thereof are to be included in computations under Rule 50. Decision will be entered under Rule 50. Footnotes*. Estimated Note: Henry C. Yeiser, 3rd, died October 12, 1935.↩1. In the case of Charles Fleischmann, 3rd, presumably these rights were given Julius Fleischmann, the "annuitant's" father.↩